UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
SHAREHOLD REPRESENTATIVE SERVICES LLC   :
*suing on its own behalf and on behalf* :
*of the former shareholders of* ORIEL   :    12 Civ. 6154 (DLC)
THERAPEUTICS, INC., *in its capacity as* :
*Stockholders' Representative*,         :    OPINION AND ORDER
                    Plaintiff,          :
                                        :
                                        :
          -v-                           :
                                        :
SANDOZ INC., SANDOZ AG, SANDOZ          :
INTERNATIONAL GmbH, JEFF GEORGE, and    :
CHRISTINA ACKERMAN,                     :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

For Plaintiff:

Roger R. Crane
Brian Koosed
Phillip Rodgers
Molly Nixon-Graf
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022

For Defendant Sandoz, Inc.:

Arthur E. Brown
Angela R. Vicari
Daphne Murdochowitz
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022

For Defendants Sandoz AG, Sandoz International GmbH, Jeff George,
and Christina Ackerman:

Faith Gay
Michael Carlinsky
Corey Worcester
Quinn Emanuel Urquhart & Sullivan, LLP
New York, New York 10010

Lauren Weeman Misztal
Quinn Emanuel Urquhart & Sullivan, LLP
1299 Pennsylvania Avenue, Suite 825
Washington D.C. 20004

DENISE COTE, District Judge:

Shareholder Representative Services LLC ("SRS") asserts a host of claims, including claims of securities fraud under the Securities Exchange Act of 1934, against the defendants on its own behalf and on behalf of the former shareholders of a merged company.  Each of the defendants has moved to dismiss SRS's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Because SRS lacked standing at the time this suit was filed to assert the federal statutory claims upon which the assertion of subject matter jurisdiction rests, the motions to dismiss are granted and this action is dismissed without prejudice.

BACKGROUND

The following facts are taken predominantly from the second amended complaint ("Complaint") and documents integral to it, and are assumed to be true for the purposes of this Opinion.  When relevant, references are also made to the original complaint ("Original Complaint") filed on August 10, 2012, and the first amended complaint ("First Amended Complaint") filed on November 13, 2012.

SRS is a stockholder representative that acts on behalf of former shareholders of selling entities in connection with

2

mergers and acquisitions when merger agreements provide for
future contingent payments or indemnification obligations.  As
SRS explains, stockholder representatives play a useful role in
mergers and acquisitions by, among other things, alleviating the
logistical issues a potential buyer would face if required to do
business with hundreds of individual shareholders instead of a
single stockholder representative.  The defendants Sandoz Inc.,
Sandoz AG, and Sandoz International GmbH ("Sandoz International")
are subsidiaries of nonparty Novartis, the world's second largest
producer of generic pharmaceutical drugs.  Defendant Jeff George
("George") is the Chief Executive Officer of Sandoz AG, and
defendant Christina Ackermann ("Ackermann") was, at relevant
times, the Global Head Legal & General Counsel for Sandoz AG.

<u>Negotiations and 2010 Merger Agreement</u>

The issues in the instant action arise out of a merger
agreement (the "Merger Agreement") executed in April 2010, in
which Sandoz Inc. purchased Oriel Therapeutics, Inc. ("Oriel"), a
bio-pharmaceutical company, and the negotiations that preceded
the execution of the Merger Agreement.  The underlying events
began in roughly July of 2009, when Oriel retained counsel to
advise it in connection with its potential sale to a third party.
The relevant negotiations began in December 2009, when Sandoz AG
sent Oriel's counsel a "non-binding bid for the purchase of"
Oriel ("Offer Letter").  The Offer Letter was signed by George

and Ackermann.  The telephone extensions for George and Ackermann listed in the Offer Letter correspond to telephone numbers that purportedly connect to offices at the headquarters of Sandoz International.

As discussed at greater length below, the proposed sale of Oriel involved the transfer and continued development of a medication referred to in this Opinion as Drug X.  Thus, the Offer Letter stated that Sandoz AG "believe[d] that Novartis' Sandoz and Pharmaceutical divisions bring to the table several key competencies and strengths that could prove critical to Oriel in order to complete the technical development of its product and establish viable commercial manufacturing operations."  The Offer Letter highlighted a German production facility known as Aeropharm.  It stated:

> In particular, Sandoz has recently invested over €50 Million to develop a state of the art Respiratory manufacturing and Development Center in Rudsolstadt, Germany [("Aeropharm")].  Additionally, Novartis Pharma possesses a very deep knowledge in respiratory device engineering and development and we plan to make those resources available to Oriel as it further scales up its manufacturing processes.  Sandoz also plans to leverage its extensive API sourcing and manufacturing capabilities to enable Oriel to gain a greater advantage in sourcing raw materials which we believe could help reduce risk of API supply quality and improve approval timelines.

According to the Complaint, the content of the Offer Letter and "similar oral representations made by and on behalf of Sandoz" convinced Oriel's Board of Directors to pursue exclusive

4

negotiations with the Sandoz defendants.  On March 22, 2010, while negotiations were ongoing, representatives of the Sandoz defendants met with representatives of Oriel and certain Oriel shareholders in New York City.  At the meeting, Daniel Salvadore, Director of Strategy of Mergers and Acquisitions for Sandoz AG told the Oriel representatives and certain Oriel shareholders that "Aeropharm was a state of the art facility," that Sandoz AG had "invested 50 million Euros to make it state of the art," and that Sandoz AG "insisted on manufacturing and testing [Drug X] at Aeropharm."  The negotiations resulted in the execution of the Merger Agreement, under which Sandoz Inc. agreed to pay the shareholders of Oriel ("Shareholders") upfront cash consideration and additional cash consideration conditioned on attainment of certain Milestone Events described in the Merger Agreement, in exchange for their shares in Oriel.

The Milestone Events were keyed to certain development goals for Drug X.  To understand these Milestone Events it is useful to mention that Drug X is intended to be a generic equivalent of a successful asthma drug ("Brand Name Drug").  The Brand Name Drug's patent is set to expire at an unspecified time in the near future and the Merger Agreement's Milestone Events contemplate that Sandoz Inc. will seek to have Drug X be the "first filed" generic equivalent of Brand Name Drug.  Accordingly, the Milestone Events involve the achievement of certain related

goals, including attainment of bio-equivalence between the Brand
Name Drug and Drug X, "demonstration that [Drug X] maintained
stability on store shelves over certain periods of time and under
certain conditions, and regulatory approval by the United States
Food and Drug Administration."  It is alleged that several of the
requirements for achieving the Milestone Events are predicated on
Drug X being tested and produced at the Aeropharm facility in
Germany.

Role of SRS under the Merger Agreement

The Shareholders were represented in the merger by plaintiff
SRS.  The Merger Agreement provides that it is "made and entered
into" by Sandoz Inc., Oxford Merger Sub Corp. ("Oxford"),[1] Oriel,
and SRS, "solely as the Stockholders' Representative."  The
Merger Agreement provides that it is "enforceable by and inure[s]
solely to the benefit of the parties" to the Merger Agreement.
The Shareholders did not individually sign the Agreement.

Section 8.1 of the Merger Agreement describes the role of
SRS as the agent and attorney-in-fact of the Shareholders.  It
provides, in part:

> By virtue of the adoption of this Agreement and/or the
> cancellation by a Former Holder of Company Options or
> Company Warrants in exchange for Merger Consideration,
> Option Consideration or Warrant Consideration pursuant
> to this Agreement, the Former Holders irrevocably
> nominate, constitute and appoint Shareholder

---

[1] Oxford was a merger subsidiary created by Sandoz Inc. for
purposes of the merger.  Following the close of the merger,
Oxford ceased to exist and Oriel became a wholly-owned subsidiary
of Sandoz Inc.

<u>Representative Services LLC as the agent and true and</u>
<u>lawful attorney-in-fact of the Former Holders</u>
("Stockholders' Representative") to take any and all
actions and make any and all decisions required or
permitted to be taken or made by the Stockholders'
Representative under this Agreement or the Escrow
Agreement, including the exercise of the right to . . .
(iv) agree to, negotiate, enter into settlements and
compromises of and comply with court orders with
respect to claims for indemnification made by Parent
under Section 7 or disputes regarding Section 1.7
[Sandoz Inc.'s obligation to use Diligent Efforts to
achieve Milestone Events]; and (v) take all actions
necessary or appropriate in the good faith judgment of
the Stockholders' Representative for the accomplishment
of the foregoing.  The power of attorney granted in
this Section 8.1 is coupled with an interest and is
irrevocable. . . . From and after the Effective Time, a
decision, act, consent or instruction of the
Stockholders' Representative shall be final, binding
and conclusive upon each Former Holder. . . .

(Emphasis supplied.)  A "Letter of Transmittal" executed by the

Shareholders, through which the Shareholders agreed to the terms

of the Merger Agreement and surrendered their shares in Oriel,

similarly described SRS's role:

By signing and submitting this Letter of Transmittal,
the undersigned hereby (a) <u>irrevocably</u> nominates
constitutes and <u>appoints Shareholder Representatives</u>
<u>Services LLC as the agent and true and lawful attorney-</u>
<u>in-fact of the undersigned (the "Stockholders'</u>
<u>Representatives")</u> to take any and all actions and make
any and all decisions required or permitted to be taken
or made by the Stockholders' Representative under the
Merger Agreement or the Escrow Agreement. . . . (b)
agrees that the power of attorney granted hereunder is
coupled with an interest and is irrevocable. . . . From
and after the Effective Time, the undersigned agrees
that a decision, act, consent or instruction of the
Stockholders' Representative shall be final, binding
and conclusive upon the undersigned. . . .

(Emphasis supplied.)

7

The Merger Agreement also contemplates that SRS will enforce Sandoz Inc.'s obligation to use "Diligent Efforts" to attain the Milestone Events that would trigger the Milestone payments described above.  Section 7.1(f) of the Merger Agreement outlines a dispute resolution process to be followed when SRS believes that Sandoz Inc. is not using "Diligent Efforts" to achieve the Milestone Events.  It provides:

> If [SRS] in good faith believes that [Sandoz Inc.] is not using the Diligent Efforts required hereby to fulfill any of the Milestone Events, then [SRS] may provide [Sandoz Inc.] with written notice thereof.  If such notice is given, [Sandoz Inc.] agrees that it will designate representatives, including at least one officer with operating responsibility for the [Drug X] Product, to meet with [SRS] within 45 days from the date of such notice to address in good faith [SRS's] belief that [Sandoz Inc.] is not using such Diligent Efforts and any steps that can be taken to cure any breach of such covenant. . . . If the participating parties fail to resolve the issues within 60 days after such notice, then [SRS], on behalf of the Earnout Participants, may assert any claims against [Sandoz Inc.] arising from breach of such covenant.

Under the Merger Agreement, SRS was entitled to receive $185,000 as compensation for its services.  It is undisputed that SRS has already received this compensation.  In addition, the Merger Agreement and Letter of Transmittal provide that Sandoz Inc. will make a $250,000 payment to SRS for inclusion in a "Reserve Amount" deposited in a U.S. Bancorp account upon the achievement of each Milestone Event 1 and Milestone Event 2. After SRS's $185,000 compensation has been paid, the Reserve Amount is to be used by SRS

> to fund any out-of-pocket costs and expenses incurred
> by the Stockholders' Representative in connection with
> actions taken by the Stockholders' Representative
> pursuant to the terms of the Merger Agreement
> (including the hiring of legal counsel and the
> incurring of legal fees and costs.). . . .

To the extent the funds in the Reserve Amount are not used, the remaining funds are distributed to the Shareholders.

Events Following Closing of Merger

The merger closed on June 1, 2010.  The Complaint alleges that, following the closing of the merger, it became evident that Aeropharm was not in fact "a state of the art facility ready to receive the equipment necessary to manufacture and test [Drug X]."  SRS's first notice of this fact came in September 2010, when Sandoz Inc. sent a report to SRS indicating that Sandoz Inc. was investigating production of [Drug X] at facilities other than Aeropharm.  In a subsequent report of January 11, 2011, Sandoz Inc. informed SRS that it would not be manufacturing [Drug X], at least initially, at Aeropharm.

The Complaint alleges that despite the fact that the Merger Agreement set September 30, 2011 as the deadline for satisfying the bio-equivalency and stability standards set forth in Milestone Event 1, Sandoz did not begin installing the necessary manufacturing equipment at Aeropharm until April 2011, was still installing equipment as of December 2011, and had not commenced manufacturing at scale as of June 28, 2012.  In addition, although the Milestone Events are framed in terms of three

9

different dose strengths for Drug X, Sandoz Inc. has unilaterally
decided to focus on a single dose strength.  In sum, as a result
of the defendants' misrepresentations, the Complaint alleges, the
Shareholders were induced to sell their Oriel securities at
artificially deflated prices.  Furthermore, as a result of Sandoz
Inc.'s failure to use diligent efforts to achieve the Milestone
Events, the Shareholders will be deprived of the Milestone
payments they would have otherwise received.

PROCEDURAL HISTORY

SRS filed its Original Complaint on August 10, 2012.  The
Original Complaint indicated that SRS filed suit in its own name,
but "on behalf of the former shareholders of Oriel Therapeutics,
Inc."  On October 22, Sandoz Inc. filed a motion to dismiss the
Original Complaint, challenging SRS's standing to sue on behalf
of the Shareholders.  Following this motion, SRS obtained
assignments from some, but not all, of the Shareholders.[2]
Pursuant to the assignments, some of the Shareholders agreed to

> [i]rrevocably, [sic] convey, transfer, <u>assign</u> and grant
> to Shareholder Representative Services LLC as
> Stockholders Representative pursuant to the Agreement
> and Plan of Merger executed as of April 10, 2010 . . .
> and Stockholders Representative Agreement executed as
> of May 19, 2010 . . . for purposes of collection, <u>all
> of Assignors' right, title and interest in and to all
> claims</u> other than contractual claims to receive
> Contingent Payments under the Merger Agreement . . .
> <u>including</u>, but not limited to, all common law fraud,
> misrepresentation and negligent misrepresentation

_____

[2] The Complaint indicates that the assignment agreement is dated
November 9, 2012.  The assignment agreement and accompanying
signature pages provided to the Court, however, are undated.

claims, <u>federal securities fraud claims</u> and state
securities fraud claims of Assignors . . . against
Sandoz Inc., Sandoz AG, Sandoz International GmbH, Jeff
George and Christina Ackerrnann [sic] . . . alleged or
to be alleged in the action pending in the United
States District Court for the Southern District of New
York

(Emphasis supplied.)   As demonstrated by the language of the

assignments, the assigning Shareholders did not assign their

contractual claims to receive contingent payments under the

Merger Agreement.   Pursuant to a Remittance Agreement between SRS

and the same Shareholders, SRS agreed to remit "all sums,

proceeds, money and other consideration obtained by it in

connection with the enforcement and collection of the assigned

claims."

     On November 13, SRS filed its First Amended Complaint, which

indicated that SRS sought to sue "on its own behalf and on behalf

of the former shareholders of Oriel Therapeutics, Inc."   On

January 1, 2013, this case was reassigned to this Court.   At the

initial pretrial conference held on January 24, the defendants

again raised the issue of SRS's standing to sue.   In particular,

defendants raised the issue of whether plaintiff's post-filing

receipt of assignments cured a lack of standing that existed at

the commencement of the action.   In light of these issues, the

plaintiff was instructed to inform the Court by February 1

whether it intended to withdraw the present action and commence a

new action.   By letter dated February 1, SRS advised that it had

decided not to commence a new action but that it would instead be filing a second amended complaint.  Accordingly, the plaintiff filed the Complaint on March 5, 2013.

The Complaint alleges that SRS has standing to sue on the basis of its role under the Merger Agreement as stockholders' representative and on the basis of its assignments from some of the Shareholders.  The Complaint raises eleven causes of action: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; (2) violation of Section 20(a) of the Securities Exchange Act; (3) breach of the Merger Agreement; (4) breach of the implied obligation of good faith and fair dealing; (5) common law fraud; (6) violation of North Carolina Securities Act § 78A-56 against Sandoz AG, Sandoz International, George, and Ackermann; (7) violation of North Carolina Securities Act § 78A-56 against Sandoz Inc.; (8) violation of California Corporate Securities Law § 25501 against Sandoz AG, Sandoz International, George, and Ackermann; (9) negligent misrepresentation; (10) equitable fraud; and (11) unjust enrichment.[3]  Notably, the Court's subject matter jurisdiction over this case, if it exists, is grounded in 28 U.S.C. § 1331, also known as federal question jurisdiction.  The Original Complaint had also identified federal question jurisdiction as the basis for this Court's subject matter jurisdiction over the lawsuit and had also pleaded violations of the federal securities laws.

12

DISCUSSION

The defendants move to dismiss the Complaint on the ground that the plaintiff does not have Article III standing to sue, and thus this Court does not have subject matter jurisdiction over this case.  In addition, the defendants contend that the Complaint should be dismissed for failure to state a claim. Because the Complaint must be dismissed for lack of subject matter jurisdiction, this Opinion does not address whether any of the causes of action in the Complaint state a claim.

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted).  On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. System, Inc., 426 F.3d 635, 638 (2d Cir. 2005).  In reviewing such a motion, the court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004) (citation omitted).  In addition, a district court may

--------------------------------------------------------

[3] The Original Complaint raised the same eleven causes of action.

13

consider evidence outside the pleadings to resolve the motion to dismiss for lack of subject matter jurisdiction.  <u>Morrison</u>, 547 F.3d at 170.

Article III, Section 2 of the United States Constitution limits the jurisdiction of the federal courts to actual cases and controversies.  <u>See</u> <u>Sprint Comm. Co., L.P. v. APCC Servs., Inc.</u>, 554 U.S. 269, 273 (2008).  One component of this limitation is the requirement that a plaintiff suing in federal court have standing to sue.  <u>Lance v. Coffman</u>, 549 U.S. 437, 439 (2007).  It is now well-established that

> [t]he irreducible constitutional minimum of standing contains three elements: (1) there must be an 'injury in fact,' -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>Port Washington Teachers' Assn. v. Board of Educ. Of Port Washington</u>, 478 F.3d 494, 498 (2d Cir. 2007) (citation omitted).  With respect to the first element of constitutional standing, the "minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim."  <u>W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP</u>, 549 F.3d 100, 108 (2d Cir. 2008).

To determine whether a plaintiff has standing to sue, the court "must look to the facts and circumstances as they existed

at the time [the] suit was initiated." Etuk v. Slattery, 936
F.3d 1433, 1440-41 (2d Cir. 1991) (standing).  "Events occurring
after the filing of the complaint cannot operate so as to create
standing where none previously existed." City of Hartford v.
Towns of Glastonbury, 561 F.2d 1042, 1051 n.3 (2d Cir. 1977) (en
banc).  This approach is consistent with courts' treatment of
other aspects of subject-matter jurisdiction as well.  Cf. Group
Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 568, 570-74
(2004) (diversity jurisdiction).

A plaintiff must demonstrate standing for each claim and
form of relief sought.  Carver v. City of New York, 621 F.3d 221,
225 (2d Cir. 2010).  In other words, "with respect to each
asserted claim, a plaintiff must always have suffered a distinct
and palpable injury to [it]self." Mahon v. Ticor Title Ins. Co.,
683 F.3d 59, 64 (2d Cir. 2012) (emphasis and citation omitted).
The Complaint raises eleven causes of action.  The fact that the
claims arise from a common set of facts does not relieve the
plaintiff of its obligation to demonstrate constitutional
standing to sue for each one.  DaimlerChrysler Corp v. Cuno, 547
U.S. 332, 352 (2006).

The plaintiff asserts that subject matter jurisdiction
exists over this action as a result of federal question
jurisdiction, pursuant to 28 U.S.C. § 1331.  Only two of the
Original Complaint's claims present federal questions.  For the

remaining claims, the plaintiff sought to invoke the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. As a result of these circumstances, if the plaintiff is unable to establish constitutional standing to assert violations of the federal securities law claims -- the claims on which the Court's original jurisdiction is predicated -- the only remaining claims would be plaintiff's state law claims. Where a court determines that "there [is] no original federal subject matter jurisdiction over the suit," it cannot "exercise supplemental jurisdiction" over state law claims. See Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996). Accordingly, if the plaintiff did not have standing to assert the federal securities law claims when it filed this lawsuit, there is no original federal subject matter jurisdiction over the suit, and thus no ability to exercise supplemental jurisdiction over plaintiff's state law claims.[4]

It is undisputed that the assignments executed by some of the Shareholders granted SRS legal title to those Shareholders' non-contract claims. Because a plaintiff's standing to sue is assessed based on facts existing at the time of filing suit, however, SRS's post-filing receipt of assignments does not cure

---

[4] In contrast, where a court dismisses the claims over which it had original jurisdiction for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), it retains discretion to exercise supplemental jurisdiction over the state law claims. A dismissal for lack of constitutional standing, however, is a dismissal for lack of subject-matter jurisdiction.

16

the standing defect that existed when this action commenced.

Conolly v. Taylor, 27 U.S. 556, 565 (1829) ("Where there is no change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit.").

SRS argues that Federal Rules of Civil Procedure 17(a)(3) and 15(c) permit a plaintiff who did not originally have standing to cure the standing defect by obtaining assignments from the owners of the claims, amending the complaint to reflect the assignments, and having the amended complaint relate back to the original filing of the complaint.  SRS misconstrues the import of these procedural rules.  Federal Rule of Civil Procedure 17(a)(3) provides that a court

> may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Fed.R.Civ.P. 17(a)(3).  Rule 17 says nothing about the jurisdiction of this Court; its sole concern is the naming of the proper party as plaintiff.  Lincoln Prop. Co. v. Roche, 546 U.S. 91, 90 (2005); Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193-94 (2d Cir. 2003).  Moreover, "Rule 17(a), like all rules prescribed by the Supreme Court, may not abridge, enlarge, or otherwise modify substantive rights. . . . It therefore cannot

provide an independent basis for standing." In re Bernard L.
Madoff Inv. Sec. LLC., -- F.3d --, 2013 WL 3064848, *14 n.25 (2d
Cir. June 20, 2013); see also Zurich Ins. Co. v. Logitrans, Inc.,
297 F.3d 528, 531-32 (6th Cir. 2002).  The same is true of
Federal Rule of Civil Procedure 15(c), which provides that "an
amendment to a pleading relates back to the date of the original
pleading when . . . the amendment changes the party or the naming
of the party against whom the claim is asserted."  Fed.R.Civ.P.
15(c).  Accordingly, because SRS's post-filing receipt of claim
assignments from some of the Shareholders cannot cure any
standing defect that existed at the time SRS filed suit, this
Opinion proceeds to consider whether SRS had standing to sue when
it filed suit on August 10, 2012.

     At the time SRS filed its Original Complaint it had not
personally suffered an injury-in-fact.  It sought instead to
raise the injuries and legal rights of the Shareholders.  Neither
the Original Complaint nor the Complaint identifies a concrete
and particularized injury that SRS has suffered as a result of
the defendants' actions.  SRS had no financial stake in the
Shareholders' claims and suffered no economic injury as a result
of defendants' actions.  Its role in the underlying events, and
at the time of this action's commencement, was that of "agent and
true and lawful attorney-in-fact" for the Shareholders.  This
role, without more, does not convert the injuries allegedly

suffered by the Shareholders into SRS's own injuries.  See W.R.
Huff Asset Mgmt. Co., 549 F.3d at 107-08.

At bottom, the Original Complaint alleges two types of
injuries that followed from defendants' conduct.[5]  First -- with
respect to the securities law claims -- the Original Complaint
alleges that the defendants' material misrepresentations or
omissions regarding the readiness of Aeropharm induced the
Shareholders to sell their shares in Oriel for artificially low
prices.  Second, the Original Complaint alleges that due to
Sandoz Inc.'s failure to use diligent efforts to achieve the
Milestone Events, the Shareholders will not receive the Milestone
payments they would have otherwise received.

Any injuries that resulted from this course of conduct were
injuries to the Shareholders, not to SRS.  The only shares
tendered to Sandoz Inc. in connection with the merger were the
shares owned by the Shareholders.  It is the Shareholders who
were allegedly defrauded by the defendants' misrepresentations,
and the Shareholders who will not receive the Milestone payments
they might have received if Sandoz Inc. had used diligent efforts
to achieve the Milestone Events.  Nothing in the Merger Agreement
or Transmittal Letter assigned the Shareholders' claims to SRS.
Instead, these documents merely designate SRS as the
Shareholders' agent and attorney-in-fact.  Because SRS had no

---

[5] This description of injury is consistent with that alleged in
the second amended complaint as well.

19

legal title to and no proprietary interest in the Shareholders'
claims, it did not satisfy the injury-in-fact requirement at the
time it commenced this action, and had no standing to raise the
Shareholders' securities law claims on their behalf.

SRS makes roughly five arguments in support of its standing
to sue.  First, it argues that it is standard practice for a
shareholder representative to act on behalf of the former
shareholders of the selling entity where a merger agreement
provides for future contingent payments and/or indemnification
obligations.  It would be inefficient and even unfeasible, it
claims, for potential buyers of companies to do business with
each individual shareholder.  But, the convenience of having a
single shareholder representative sue on behalf of all former
shareholders does not relieve SRS of the obligation to satisfy
the irreducible minimum of constitutional standing.  In any
event, the constitutional standing requirement does not vitiate
the utility of such arrangements since a shareholder
representative who has received claim assignments from
shareholders has standing to assert the assigned claims.  Cf.
Sprint Comm. Co., L.P, 554 U.S. at 285.

Next, SRS claims that because the Merger Agreement
explicitly empowers SRS to "assert claims on behalf of" the
Shareholders, SRS must have standing to sue.  This argument
confuses contractual authorization to sue with constitutional

standing requirements.  Article III, Section 2 requires a plaintiff to demonstrate that it personally suffered or will imminently suffer an injury in fact.  A principal may authorize its agent to sue on the principal's behalf, but this authorization does not vest the agent with legal title to, or a proprietary interest in the principal's claims.  See W.R. Huff Asset Mgmt. Co., 549 F.3d at 107-08.  Contractual authorization to sue -- when unaccompanied by a transfer of legal title or proprietary interest in a claim -- is akin to a grant of "consent" to a plaintiff's standing to sue.  But, it is a long established principle that "parties may not confer subject matter jurisdiction on the court by consent." United States v. 27.09 Acres of Land, 1 F.3d 107, 111 (2d Cir. 1993) (citation omitted). The fact that Sandoz Inc. and the Shareholders agreed that SRS was authorized to assert claims arising out of the Merger Agreement is insufficient to confer constitutional standing on SRS to raise the Shareholders' claims.

Next, SRS points out that the Merger Agreement is "enforceable by and inure[s] solely to the benefit of" the parties to the Merger Agreement, and that while SRS is a party to the Merger Agreement, the Shareholders are not.  In a similar vein, SRS points to Section 8.11 of the Merger Agreement in which it was "agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement."

Because the Shareholders were not themselves parties to the Merger Agreement, SRS argues, the Merger Agreement bars them from suing in their own names to enforce the Merger Agreement.[6] Assuming without deciding that SRS's position as counterparty to the Merger Agreement is sufficient to vest it with constitutional standing to sue for breach of the Merger Agreement, this provides no basis to find that SRS has standing to assert the Shareholders' federal securities law claims.  A plaintiff must establish its standing to sue for each claim it asserts and SRS fails to explain how its role as contractual counterparty to the Merger Agreement vests it with standing to raise the Shareholders' federal securities law claims.

Next, SRS claims that it has suffered an injury-in-fact because, as a result of Sandoz Inc.'s failure to use diligent efforts to achieve Milestone Events 1 and 2, it will not receive the $250,000 payments it would have received upon the satisfaction of each event.  Upon closer consideration, however, this alleged "financial injury" is revealed to be no more than a

---

[6] In further support of its argument that its role as counterparty to the Merger Agreement vests it with a kind of interest sufficient to substantiate its constitutional standing to sue, SRS cites Global Aerospace, Inc. v. Platinum Jet mgmt, LLC, 488 Fed.App'x 338, 340-41 (11th Cir. 2012).  In Global Aerospace a managing agent for a pool of three insurance companies was found to have standing to sue for a declaration of non-coverage and breach of an insurance policy, in part because the managing agent had signed the insurance contract in its own name.  Id. at 340-41.  Global Aerospace is an unpublished Opinion.  Pursuant to Eleventh Circuit rules such Opinions are "not considered binding precedent," but "may be cited as

byproduct of the present litigation.  The Merger Agreement does
require Sandoz Inc. to pay SRS $250,000 upon achievement of
Milestone Events 1 and 2.  Each such payment is added to a
"Reserve Amount," which is deposited by SRS in a U.S. Bancorp
account.  Under the Merger Agreement SRS is

> entitled to recover, from the Reserve Amount . . . any
> out-of-pocket costs and expenses incurred by the [SRS]
> in connection with actions taken by [SRS] pursuant to
> the terms of this Agreement (including the hiring of
> legal counsel and the incurring of legal fees and
> costs). . . . Compensation of $185,000 to [SRS] for its
> services shall be paid from the Reserve Amount.

Neither the Original Complaint nor the second amended complaint
alleges that SRS has incurred any costs or expenses that would
need to be paid out of the Reserve Amount.  In the absence of any
costs or expenses, SRS has no entitlement to the funds in the
Reserve Amount and the funds are disbursed to the Shareholders.
Of course, it is possible that SRS has incurred costs and
expenses in order to pursue this litigation -- a fact not alleged
in the Original Complaint or the second amended complaint.  It is
well-established, however, that "a plaintiff cannot achieve
standing to litigate a substantive issue by bringing suit for the
cost of bringing suit."  Steel Co. v. Citizens for a Better
Environment, 523 U.S. 83, 107(1998).  Thus, the legal fees and
costs SRS may have incurred in pursuing the instant litigation
are insufficient to confer standing to sue.

---

persuasive authority."  11th Cir. R. 36-2.

Finally, SRS claims that its role as stockholder representative entitles it to the narrow exception to the injury-in-fact requirement articulated in W.R. Huff Asset Management Co. v. Deloitte & Touche LLP.  In W.R. Huff Asset Management Co., an investment advisor sought to sue on behalf of its investor clients for the defendant's alleged securities law violations. W.R. Huff Asset Mgm't Co., 549 F.3d at 104.  The court first concluded that the advisor had not suffered an injury-in-fact. It recognized, however, there are a "few well-recognized, prudential exceptions to the 'injury-in-fact' requirement," when a plaintiff "can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests."  Id. at 109.  For example,

> courts historically have permitted trustees to bring suits to benefit their trusts; guardians ad litem to bring suits to benefit their wards; receivers to bring suit to benefit their receiverships; assignees in bankruptcy to bring suit to benefit bankrupt estate; and executors to bring suit to benefit testator estates.

Id. at 109-10 (citation omitted).  Even if this list of special relationships may be read as commentary on the requirements for Article III standing, the stockholder representative-stockholder relationship is not the type of relationship that should similarly entitle the stockholder representative to bring suit to benefit its clients.  In sum, SRS has not satisfied Article III's requirements of standing.

CONCLUSION

The defendants' March 27 motions to dismiss the Complaint are granted.  The Complaint is dismissed without prejudice.  The Clerk of Court shall close the case.

Dated:    New York, New York
          August 7, 2013


_____
          DENISE COTE
     United States District Judge